# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DANIEL SCHUR, Individually, and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) ) | Civil Action No. 17-cv-546 (PGG) |
| STRATEGIC FINANCIAL SOLUTIONS, LLC and STRATEGIC CONSULTING, LLC, RYAN SASSON and KIM CELIC, ) ) ) ) ) | |
| Defendants. ) ) | |

## DECLARATION OF HALTON BAGLEY

I, Halton Bagley, hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am over the age of 21, competent to testify, and if called to testify would do so consistent with all matters set forth herein.

2. I am the Named Plaintiff in the above-captioned lawsuit.

3. I was employed as a Sales Representative by Strategic Financial Solutions ("SFS" or "Defendant") from June 6, 2016 through August 16, 2016.

4. With the exception of my first week, during my entire employment with SFS, I and approximately 75-85 other Sales Representatives worked out of Defendant's office located at 711 3rd Avenue, 6th Floor, New York, NY, where we were assigned a cubicle and an integrated desktop computer/telephone. Each of us also had a designated telephone line.

1

5. Throughout my employment, SFS classified me and its other Sales Representatives as non-exempt. During my first week, my hourly rate was $26.44. After this time, my hourly rate was reduced to $14.42 which was considered a "draw" against my earned commission.

6. SFS holds itself out as a provider of debt consolidation, modification and relief services to customers across the United States. My duties consisted of calling leads generated by SFS, communicating with potential customers by phone and email, qualifying customers by analyzing their credit situation, and persuading them to purchase debt settlement products of SFS.

7. SFS continuously stressed, pressured and reinforced to me and its other Sales Representatives that our goal was to enroll as much unsecured debt into the SFS debt settlement program as possible. To help achieve this goal, SFS established quotas for its Sales Representatives. These quotas, which were measured in terms of the total amount of unsecured customer debt Sales Representatives had enrolled in Defendants' modification program at any given time, would progressively increase during our employment.

8. To encourage sales, the exact amount of debt each Sales Representative had enrolled into Defendants' modification program was tracked in real time by SFS and displayed on large monitors at Defendants' offices which was visible to all Sales Representatives. Each Sales Representative was ranked based on the amount of debt they had enrolled that month. Four colors (green, blue, yellow and red) indicated the level of debt each Sales Representative had enrolled at any given time. For example, green indicated that the Sales Representative was in the top tier of all performers, while red meant that the Sales Representative was in the bottom tier. SFS fired any Sales Representative who was "in the red" for more than two months. Other monitors displayed a ranking of each Sales Representative based on

their "Conversion Rate", which represented the percentage of time each Sales Representative sold (or "closed") a debt settlement product on a new lead.

9. During the initial two-week training period and after, SFS reinforced its directive that I and other Sales Representatives work a minimum of 10 hours a day Monday through Friday, with the workday typically starting at 10:00 am. At the same time, SFS advised me and other Sales Representatives that we were generally not permitted to record more than 8 hours of work each day, regardless of the actual number of hours we worked. Defendants emphasized the importance of working late, including well after 8:00 p.m., because many customers and potential customers were located in states on Pacific Standard Time. In fact, SFS referred to the hours between 6:00 pm and 9:00 pm as "prime time", as these were the hours most people would be expected to answer calls. SFS provided incentives for Sales Representatives to begin work earlier than 10:00 am and stay later than 8:00 pm.

10. Defendants conveyed their directives in several ways. For example, SFS required me and its other Sales Representatives to attend weekly meetings every Monday at 10:00 am. Defendants' supervisors, including Ryan Bitters and Chadi Bitar, attended those meetings. These meetings were headed by Defendant Ryan Sasson, Defendant's Chief Executive Officer, and less frequently by Daniel Blumkin, its President and Chuck Ellison, its Chief Revenue Officer. The agenda at these meetings was to advise us of our sales numbers, give awards to high performers, and emphasize Defendants' requirement that Sales Representatives work at least 9-10 hours each day but generally not to record more than 8. This work and timekeeping directive was repeatedly and explicitly made by Ryan Sasson.

11. To perform our duties, each day I and Defendant's other SFS Sales Representatives had to log-in to our computer and access the sales portal used by SFS, called "Velocify."

3

12. SFS used ADP time and attendance software ("the ADP software") to record the time worked by me and its other Sales Representatives.

13. During the first two weeks of my employment, I was not permitted to enter any of my time worked into the ADP software. Instead, personnel from Defendant's Human Resources Department inputted all of my times into the ADP software. Specifically, during this period they inputted my daily "in time" as 8:00 am and my daily "out time" as 4:00 p.m. These times were inaccurate. In reality, during training I typically worked from between 9:30 and 10:00 a.m. until between 6:00 pm and 7:00 pm. Throughout the remainder of my employment, I typically worked from 10:00 am to 8:00 pm and later.

14. After my initial two weeks of employment, I inputted my daily "in" and "out" time into the ADP software. Consistent with Defendants' stated policy, I generally avoided recording more than 8 hours on the ADP software even though I typically worked 9 or more hours each workday.

15. Defendants' Human Resource personnel, including Adriann Dalton, Melissa Ganchev (Grimmer) and Defendant Kim Celic, actively monitored time entries made by Sales Representatives to ensure compliance with SFS policies as described above. If on any given day, a Sales Representative was close to going over 8 hours, SFS supervisors, including Ryan Bitters and Chadi Bitar, both of whom could access Sales Representatives' the time entries on their computers, would instruct us to clock out and keep working. If a Sales Representative recorded more than 8 hours of work on the ADP software, these supervisors would alter the time entries to reduce our recorded time worked. For example, they would alter my "out" time entries to make it appear as if I worked until exactly 8:00 p.m., when I actually often worked well after this time. It was these altered time entries

4

which were submitted by the SRS supervisors to payroll for processing. Sales Representatives could not directly submit time entries to payroll.

16. Notwithstanding Defendants' policies and practices, I was paid for some limited overtime. However, I estimate that Defendant failed to pay for approximately 5 hours of time worked in excess of 40 hours during each week of my employment.

17. All Sales Representatives employed by SFS worked out of the same physical office, were subject to the same policies and practices, had the same work schedule and duties, were assigned the same equipment, and had the same supervisors.

Dated: June 28 , 2017

DocuSigned by:

*Halton Bagley*

2F6016A8994D46F...

Halton Bagley